# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 21-CR-178(APM)** |
| | **:** | |
| | **:** | |
| **SHELLY STALLINGS, et al.,** | **:** | |
| | **:** | |
| **Defendants** | **:** | |

## SENTENCING MEMORANDUM OF SHELLY STALLINGS WITH MOTIONS FOR DEPARTURE AND VARIANCE

**May it please the Court:**

### Summary of Argument

For the reasons set forth below, the Court should depart downward pursuant to U.S.S.G. §5K2.0(a)(3), vary downward pursuant to 18 U.S.C. §3553(a), and sentence defendant to a term of one day custody followed by a three year term of supervised release with special conditions, including a one year term of home detention, participation in cognitive-behavioral treatment as directed and supervised by the United States Probation Office, and psychiatric treatment and counseling as required.

The presentence report (DN 184, Final Presentence Report [hereinafter referred to as "PSR"] assesses a total offense level of 23. Of this total, 10 offense levels are special offense characteristic enhancements under U.S.S.G. §§2A2.2(b)(2)(B) and 3A1.2(c)(1) for assaulting law enforcement officers with a dangerous weapon. While the black letter of those guideline

provisions may technically apply to defendant's actions, her actual conduct was sufficiently outside the heartland of the typical case embodying the enhancements that a downward departure pursuant to U.S.S.G. §5K2.0(a)(3) is justified.

The PSR recommends a custodial sentence of 46 to 57 months. This is greater than necessary to satisfy the requirements of 18 U.S.C. §3553(a)(2), and the Court should vary downward. A sentence of one day followed by a three year term of supervised release with a special condition of one year home confinement; the other special conditions recommended herein; and the standard strict controls, conditions, and sanctions attendant to supervised release will be sufficient to satisfy the requirements of the statute. Such a sentence will provide defendant with effective correctional treatment; deter like minded individuals from committing similar crimes; protect the public from further criminal conduct of the defendant; and constitute just punishment for her offense. A longer sentence will not satisfy the statutory purposes of sentencing to any greater degree. Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. §3553(a)(2).

Ms. Stallings, has no prior felony or serious misdemeanor convictions, has only previously been in jail for a total of 30 days, has never had the remedial benefit of competent treatment and counseling before being placed on federal pretrial release, and has proven by her conduct while on both pretrial release and release pending sentencing that she can and will conform to the remedial aspects and requirements of supervised release.

**The Charges of Conviction**

Defendant entered pleas of guilty without a plea agreement to seven counts arising out of her participation in demonstrations at the Capitol on January 6, 2021, during a joint session of Congress to certify the vote count of the Electoral College for the 2020 Presidential election, specifically Civil Disorder in violation of 18 U.S.C. §§231(a)(3) and 2; Assaulting, Resisting, or Impeding an Officer Using a Dangerous Weapon (i.e., pepper spray) in violation of 18 U.S.C. §§111(a)(1) and (b); Entering and Remaining in a Restricted Building or Grounds with a Dangerous Weapon (i.e., pepper spray) in violation of 18 U.S.C. §§1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon (i.e., pepper spray) in violation of 18 U.S.C. §§1752(a)(2) and (b)(1)(A); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (i.e., pepper spray) in violation of 18 U.S.C. §§1752(a)(4) and (b)(1)(A); Disorderly Conduct in the Capitol Grounds or Buildings in violation of 40 U.S.C. §5104(e)(2)(D); and Engaging in an Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. §5104(e)(2)(F).

**The Statutory Penalties**

The §231(a)(3) charge carries a maximum sentence of 5 years imprisonment; the §111(a)(1) charge, a maximum sentence of 20 years imprisonment; each of the §1752 charges, a maximum sentence of 10 years imprisonment; and each of the §5104 charges, a

maximum sentence of 6 months imprisonment. In addition, a term of supervised release not exceeding a total of 3 years may be imposed.

## The Underlying Facts

On January 6, 2021, Shelly Stallings and her husband[1], co-defendant Peter Schwartz, lived in Uniontown, Pennsylvania, where both worked. Schwartz insisted that the two of them attend the "Stop the Steal" rally in Washington, D.C. to protest the impending certification by Congress of the 2020 presidential election. She did not want to miss work to protest the election, but agreed to accompany him out of fear of physical abuse by him if she did not. Schwartz regularly abused Stallings, and his threats were credible. He was and remains a controlling and volatile individual with a long history of violent crime, including convictions in 2005 for assault with a dangerous weapon with serious injury, in 2017 for terroristic threatening and possession of a firearm by a convicted felon, in 2019 for terroristic threatening, and again in 2020 for terroristic threatening and possession of a firearm by a convicted felon.

Stallings and Schwartz attended the "Stop the Steal" rally and then, at the behest of then President Trump and the other rally speakers, moved to the Capitol with the rest of the crowd. They arrived at approximately 2:00 p.m. just as others in the crowd who had arrived earlier broke into the Capitol. Although she herself did not participate in the breach of the Capitol and the damage to the building, she saw the barricades and Capitol police defending

---

[1] Defendant and her husband are now estranged, and she has filed for divorce.

the building and grounds from the crowd with pepper spray and tear gas and knew that she was not authorized to be there.

At approximately 2:20 p.m., she, Schwartz, and the other co-defendants—Maly and Brown—were part of a group that had gathered on the Lower West Terrace outside of the Capitol and were blocked from further access to the building by Capitol police. Schwartz was armed with a tire thumper (similar to a billy club and used by truck drivers to quickly check tire pressures by hitting the tire), and she observed him initiate a direct physical assault on a group of officers by throwing a metal chair at them which temporarily drove them back, leaving their cache of pepper spray exposed and unattended. Schwartz seized the pepper spray canisters, pulled the safety pins, and began spraying the officers with them. When he did so, he was not under attack or otherwise in need of protection from any person. Nor was he defending himself, Ms. Stallings, or any other person. One of the co-defendants, either Schwartz or Brown, handed her a canister of the pepper spray and told her to spray as well. She did so for a very short time which she estimates to have been approximately 4 seconds and then handed the canister back to Schwartz, saying "I'm not doing this!".

Although Ms. Stallings never entered the Capitol building itself, she did—as she freely admitted to the FBI during an interview in June, 2021—briefly enter the Capitol tunnel mentioned in PSR ¶29. She was "getting 'smashed' by the crowd" in the tunnel, but was "able to get out from the flow of the crowd and walk away from the immediate area".[2] She

---

[2] See FD-302 6/28/2021, p. 7.

maintains that "when she entered the tunnel, the press of the crowd forced her to leave after only a few minutes." (DN 174) . On December 12, 2022, counsel for the United States provided the undersigned with "Exhibit 103.asf", a 41 minute video taken from inside the tunnel on January 6, 2021, and covering the time from 2:49:00 p.m. to 3:30:00 p.m. That video is consistent with defendant's recollection. At 2:49:00 p.m. (Index 00:00), the video shows a large crowd already filling the tunnel and others attempting to enter it. Defendant is not shown entering the tunnel until 3:09:44 p.m. (Index 20:44) and leaving—as she has said she did—"a few minutes later" at 3:14:32 p.m. (Index 25:32) by pushing against the crowd still entering the tunnel. She is out of frame when the "heave ho" pushing of the crowd occurs as detailed in PSR ¶29, and it is impossible to determine who is pushing and who is being pushed and whether she is chanting or not. She re-enters the frame after the "heave ho" ceases and is shown pushing her way out of the tunnel exactly as she told the FBI she did. While the PSR implies that defendant was somehow an instigator of the pushing—as opposed to being caught up in it—that is conjecture based on thin evidence. All agree, however, that while in the tunnel, co-defendants Schwartz, Brown, and Maly directly attacked officers, while Ms. Stallings did not. (PSR ¶29).

In February, 2021, the FBI arrested Schwartz and conducted a search of his and defendant's home in Pennsylvania. She voluntarily spoke with the FBI and admitted attending the Trump rally on January 6, 2021, and being at the Capitol that day. She admits that she initially lied to protect Schwartz, saying that he acted in self defense and that guns

found in the house belonged to her, not Schwartz, who was a convicted felon. However, she truthfully told the FBI that Schwartz had actually physically possessed the weapons despite his being a convicted felon.

In June, 2021, prior to her indictment in this case, Ms. Stallings initiated contact with the FBI to correct her February statement. She truthfully told the agents at that time that the guns seized in Pennsylvania in February actually did belong to Schwartz (as opposed to his merely possessing them); that at the Capitol, Schwartz's attacking of the police had not been in defense of himself or of her; and that it was Schwartz who had actually initiated the melee by throwing the metal chair and striking the officers. As discussed above, she admitted in the June interview that she entered the Capitol tunnel briefly, but continued to deny her personal involvement in any of the spraying. However in December, 2021, when confronted with videos and photos of the incident at the Capitol, she admitted her conduct to FBI agents.

Defendant was charged herein on February 9, 2022. She pled guilty to all charges on August 24, 2022, and did so because she is guilty, acknowledges her guilt, and is remorseful for her conduct.

Ms. Stallings has assisted the United States in the prosecution of this case, meeting multiple times with the FBI and offering to testify at the trial of the co-defendants as to their actions and intent on January 6, 2021. This is despite post-indictment efforts by the co-defendant Schwartz to tamper with her testimony and thwart her cooperation. In a letter he sent to her in April, 2022, he exhorted her not to talk to or cooperate with the government or

even her own attorney, let alone plead guilty in the case, as she has done. The letter—clearly an obstruction of justice and intimidation of a witness—was turned over to the FBI and counsel for the United States.

In summary, as the government itself has acknowledged on the record herein: "Stallings has no violent criminal history, voluntarily met with law enforcement many times, turned over her devices voluntarily and eventually came clean about her conduct". (DN 92, p. 4).

### The Presentence Report

The PSR correctly groups all counts and concludes that the prevailing guideline is U.S.S.G. §2A2.2. (PSR ¶¶44-56). The base offense level is deemed to be 14 under U.S.S.G. §2A2.2(a). (PSR ¶58). To this is added 4 levels under U.S.S.G. §2A2.2(b)(2)(B) because pepper spray technically meets the black letter definition of a "dangerous weapon" in U.S.S.G. §1B1.1. (PSR ¶59). Because Ms. Stallings' conviction is under 18 U.S.C. §111(b), 2 levels are added pursuant to U.S.S.G. §2A2.2(b)(7). (PSR ¶60). Because "in a manner creating a substantial risk of serious bodily injury, the defendant had reasonable cause to know the individuals toward whom she deployed OC spray were law enforcement officers", 6 levels are added under U.S.S.G. §3A1.2(c)(1). (PSR ¶61). After subtracting 3 levels for acceptance of responsibility and timely plea, the total offense level is 23. (PSR ¶¶66-68).

Defendant is deemed to have a total of 1 criminal history point for a 10 year old misdemeanor conviction for driving under the influence of alcohol. (PSR ¶74). This makes

her criminal history category I.  (PSR ¶¶74-75).

A total offense level of 23 and a criminal history category of I result in an advisory guideline sentencing range of 46 to 57 months, D zone. (PSR ¶136).

## Motion for Downward Departure

Defendant sprayed, albeit briefly, OC spray (Oleoresin Capsicum or pepper spray) "towards"[3] law enforcement officers during the offense conduct herein. (PSR ¶¶28, 59, 61). For this conduct, the PSR assesses a total increase of 10 offense levels[4] as specific offense characteristics—a 4 level enhancement under U.S.S.G. §2A2.2(b)(2)(B)[5] because OC spray (pepper spray) meets the black letter definition of a "dangerous weapon" under U.S.S.G. §1B1.1[6] (PSR ¶59), and a 6 level enhancement under U.S.S.G. §3A1.2(c)(1)[7] because "in a manner creating a substantial risk of serious bodily injury, the defendant had reasonable

---

[3] The precise word used by the PSR.

[4] Had any officer actually been hit or injured by the spray, additional levels would have been added under U.S.S.G. §2A2.2(b)(3), but there is no allegation or evidence that this was the case.

[5] U.S.S.G. §2A2.2(b)(2)(B) provides in pertinent part that "[i]f . . . a dangerous weapon (including a firearm) was otherwise used, increase by **4** levels".

[6] A "dangerous weapon" is defined by the guidelines as, *inter alia*, "an instrument capable of inflicting death or serious bodily injury". U.S.S.G. §1B1.1 Application Note 1(E). The guidelines define "serious bodily injury" as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation". U.S.S.G. §1B1.1 Application Note 1(M).

[7] U.S.S.G. 3A1.2(c)(1) provides in pertinent part that six offense levels are added "[i]f, in a manner creating a substantial risk of serious bodily injury, the defendant . . . knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense . . . .".

cause to know the individuals towards which she deployed OC spray were law enforcement officers". (PSR ¶61). This 10 level enhancement contributes to the defendant's total offense level of 23 and, therefore, serves to significantly increase the advisory guideline sentencing range applicable to her case.

The Court should downward depart from the advisory guideline sentencing range ordinarily recommended for a total offense level of 23 because defendant's actual conduct was outside the heartland of typical cases embodying assaults on police officers while using dangerous weapons in a manner creating a substantial risk of serious bodily injury.

The Sentencing Reform Act permits a sentencing court to downward depart from an otherwise applicable advisory guideline range if the court finds a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described". 18 U.S.C. §3553(b). This is codified in the Federal Sentencing Guidelines themselves.

> A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

U.S.S.G. §5K2.0(a)(3). This is the so-called "heartland" departure, permitting courts to sentence below the guideline range in cases that are not typical of the usual type considered by the Sentencing Commission in formulating the guidelines. In defendant's case, the

question is whether the brief spraying of pepper spray "towards" (PSR ¶61) police officers is within the heartland of the typical case the Sentencing Commission considered in formulating the guidelines for assaulting police officers with dangerous weapons in a manner creating a substantial risk of serious bodily injury.

> Turning our attention, as instructed, to the Guidelines Manual, we learn that the Commission did not adequately take into account cases that are, for one reason or another, "unusual." 1995 U.S.S.G. ch. 1, pt. A, intro. comment. 4(b). The Introduction to the Guidelines explains:
>
> > "The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." Ibid.
>
> The Commission lists certain factors that never can be bases for departure (race, sex, national origin, creed, religion, socioeconomic status, 1995 U.S.S.G. § 5H1.10; lack of guidance as a youth, § 5H1.12; drug or alcohol dependence, § 5H1.4; and economic hardship, § 5K2.12), but then states that with the exception of those listed factors, it "does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." 1995 U.S.S.G. ch. 1, pt. A, intro. comment. 4(b).

Koon v. United States, 518 U.S. 81, 93 (1996). In determining whether to downward depart in a particular case from the otherwise applicable guideline calculation, a court should look to whether there is something that "makes the case different from the ordinary case where the factor is present". United States v. Rhodes, 145 F.3d 1375, 1382 (D.C. Cir. 1998) (citing Koon, 518 U.S., at 95). In short, is briefly spraying pepper spray "towards" officers, none of

whom are alleged to have been hit or injured, typical of the type of conduct the Sentencing Commission considered when recommending a total increase of ten offense levels for assaulting police officers while using a dangerous weapons in a manner creating a substantial risk of serious bodily injury? Clearly not.

U.S.S.G. §§2A2.2(b)(2)(B) and 3A1.2(c)(1) are blunt tools indeed, and their rote application can result in widely disparate conduct being unreasonably treated the same for sentencing purposes. For example, the guidelines apply the same 10 level increase for a defendant who uses a loaded firearm as they do for someone like the defendant, who used pepper spray. Indeed, had defendant actually discharged a firearm aimed directly at police officers instead of merely spraying pepper spraying the air "towards"[8] police officers, she would have been assessed only 1 additional offense level[9] for a total enhancement of 11 instead of 10. Lumping pepper spray use in with the firing of a gun is not reasonable. The instant offense is precisely the type of case the Sentencing Commission had in mind when it said:

> The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

---

[8] PSR ¶ 61.

[9] U.S.S.G. §2A2.2(b)(2)(A).

U.S.S.G. ch. 1, pt. A, intro. comment. 4(b). Defendant's conduct herein being outside the heartland of typical cases involving the use of dangerous weapons to assault police officers in a manner creating a substantial risk of serious bodily injury, the Court should depart downward.

**Determining the Appropriate Sentence**

Whatever the Court determines defendant's total offense level and criminal history category to be under the Federal Sentencing Guidelines, those guidelines are only one of the many sentencing factors to be considered by the Court in crafting an appropriate sentence.

The Sentencing Reform Act, 18 U.S.C. §3553, *not* the Federal Sentencing Guidelines, control sentencing. While 18 U.S.C. §3553(a)(4) requires the Court to *consider* the guidelines in imposing sentence, the guidelines must not be treated as mandatory or even presumptively correct. Gall v. United States, 552 U.S. 38, 49, 51 (2007); Nelson v. United States, 555 U.S. 350, 352 (2009). Under 18 U.S.C. §3553(a), the *advisory* guideline sentencing range is only "one factor among several" to be considered in imposing an appropriate sentence. Kimbrough v. United States, 552 U.S. 85, 90 (2007). The other co-equal factors a sentencing court must consider in addition to the guidelines are the nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. §3553(a)(1)) and the need of the sentence to 1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 2) to afford adequate deterrence to criminal conduct; 3) to protect the public from further crimes of the

13

defendant; and 4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2). The Court must "consider all of the §3553(a) factors", "make an individualized assessment based on the facts presented", Gall, 552 U.S. at 49-50, and explain how the facts relate to the statutory purposes of sentencing. Id., at 53-60; Pepper v. United States, 562 U.S. 476, 491- 494 (2011).

In determining what sentence should be imposed for crime, prosecutors, probation officers, and the guidelines themselves focus almost exclusively on just one of the many §3553(a)(2) factors—punishment—to the exclusion of all of the others. But in enacting the Sentencing Reform Act, Congress did "not favor [ ] one purpose of sentencing over another". See S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case". Id., at 68. In choosing what kind of sentence to impose, the Court "must consider" all of the purposes and factors set forth in §3553(a), not just punishment or the advisory guideline sentence. Id., at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." Id. Presumably, that directive applies to determining the length and type of a sentence as well.

After considering all of the factors set forth in §3553(a)—not just the advisory Federal Sentencing Guidelines—the Court must impose a sentence that is "sufficient but not greater than necessary" to satisfy all of the statutory purposes of sentencing: just punishment,

deterrence, protection of the public, and rehabilitation of the defendant in the most effective manner. 18 U.S.C. §3553(a). This so-called "parsimony provision" represents the "overarching" command of the Sentencing Reform Act. Kimbrough, 552 U.S., at 101.

### The Court Should Vary Downward from the Advisory Guideline Sentencing Range

After considering the history and characteristics of the defendant as required by 18 U.S.C. §3553(a)(1) and the statutory purposes of sentencing as required by 18 U.S.C. §3553(a)(2), the Court should vary downward from the advisory guideline sentencing range recommended by the PSR and impose a sentence of one day custody followed by a three year term of supervised release with a condition that defendant spend the first year of supervised release in home detention. Such a sentence, with all of the stringent requirements, controls, monitoring, and sanctions supervised release entails, as well as any other conditions the Court should deem appropriate, will be sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. §3553(a)(2). Such a sentence will provide defendant with effective treatment; deter like minded individuals from committing similar crimes; protect the public from further criminal conduct of the defendant; and constitute just punishment for her offenses.

### A. The Recommended Sentence Will Provide Defendant with Needed Correctional Treatment in the Most Effective Manner.

Everyone is familiar with the benefits of the remedial and correctional treatment programs of the Bureau of Prisons, whether it is the Residential Drug Abuse Program

(RDAP) or the Female Integrated Treatment Program (FIT) detailed in PSR ¶150. However, defendant should not and need not be incarcerated in order to avail herself of such benefits because all of these benefits are also available in the non-custodial setting of supervised release. In fact, the Sentencing Reform Act specifically prohibits imposing a custodial sentence just for the purpose of availing a defendant of the Bureau of Prisons' custodial remedial and correctional treatment programs.

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. §3582(a) (emphasis added). In short, defendant should not be incarcerated just so she may benefit from FIT or any other remedial or correctional treatment or program of the Bureau of Prisons. *Indeed, there is no need to do so.* Any treatment or rehabilitation the Court feels is indicated in Ms. Stallings' case can be obtained under the auspices and supervision of the United States Probation Office while she serves her 1 year of home incarceration and her 3 year term of supervised release. She need not be imprisoned to get the same benefits of the custodial FIT program as outlined in PSR ¶150, i.e., "cognitive-behavioral treatment for substance use disorders, mental illness, and trauma related disorders". This can, and routinely is, provided by USPO as part of its home incarceration and supervised release supervision.

Defendant's rehabilitation has already commenced while on release pending trial and sentencing and will continue while on supervised release. She has been evaluated by the United States Probation Office for mental health and drug issues and found "not to require additional mental health or substance abuse treatment". (PSR ¶ 116). She has had numerous random drug tests over the thirteen months she has been on pretrial and presentence supervision by the United States Probation Office without a single positive or reported stall. (Id.). While on supervised release, defendant will continue receiving whatever treatment and therapy her probation officer deems necessary through the "community partners" of the FIT program and the other rehabilitative resources of the United States Probation Office. And, of course, the conditions of her supervised release will require such continuing treatment, monitoring, and sanction for any failure. A custodial sentence of any length—let alone a guideline sentence—will provide no greater amount of "needed educational or vocational training, medical care, or other correctional treatment" than a sentence of 1 year home incarceration and 3 years of supervised release. Accordingly, that recommended sentence is sufficient, but not greater than necessary, to satisfy the requirement of 18 U.S.C. §3553(a)(2)(D).

## B. The Recommended Sentence Will Protect the Public from Further Crimes of the Defendant.

A common mantra from the government is that only incarceration can protect the public from further crimes by this or any defendant. This is not true in Ms. Stallings' case.

First, the Sentencing Commission itself deems Ms. Stallings to be a low risk of re-offending. She is a criminal history category I. What does that mean? The Sentencing Commission's criminal history category is not just an arbitrary ranking system pulled out of thin air. Rather, the purpose and methodology of the Sentencing Commission's criminal history category calculation are to accurately assess the true seriousness of a defendant's criminal history and, more importantly, *the likelihood that he or she will commit other crimes in the future*.

> To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation.

U.S.S.C. Guidelines Manual, Chapter Four-Criminal History and Criminal Livelihood, Part A-Criminal History, Introductory Commentary. The factors relied upon by the Commission for the assignment of criminal history points to a particular conviction (i.e., the nature of the offense, the severity of the sentence, and the length of time that has passed since the conviction or release from imprisonment) and the aggregation of those points into a criminal history category for sentencing purposes are not arbitrary. They are based on "extant empirical research assessing correlates of recidivism and patterns of career criminal behavior". (Id.). Applying this "extant and empirical research", the Sentencing Commission deems those in criminal history category I—and thus Ms. Stallings—to be the lowest risk of re-offending.

However, the Court need not rely merely upon the Sentencing Commission's "predictions" of Ms. Stallings' low risk of recidivism in order to reasonably insure that the public is protected from future criminal conduct by her. Her one year of home incarceration and her three year term of supervised release will carry stringent requirements, controls, monitoring, and sanctions, which will actively serve to prevent any further criminal activity on pain of lengthy terms of imprisonment should she violate any of the terms of her supervised release. U.S.S.G. §§5D1.3, 7B1.1-7B1.5. The Court may and should also impose *any* additional special conditions of supervised release it deems necessary to further protect the public, such as drug and alcohol treatment, therapy, and counseling or psychological or psychiatric treatment as approved by the Probation Office. U.S.S.G. §§5D1.3(b) and (d). The important thing here is that Ms. Stallings has a track record. For 13 months she has proven her ability and motivation to comply with such conditions and will continue to do so while on supervised release.

The defendant has no prior felony or serious misdemeanor convictions, has only previously been in jail for a total of 30 days, has never had the remedial benefit of competent treatment and counseling before being placed on federal pretrial release, and has proven by her conduct for the past 13 months that she can conform to the remedial aspects and requirements of supervised release. The Court should not assume—without even trying—that terms of home detention and supervised release will fail to protect the public and that

incarceration is necessary. Defendant asks that she at least be given the opportunity to succeed, as supervised release supervision is intended to do.

A guideline sentence will not protect the public to a greater degree than the recommended sentence. Accordingly, the recommended sentence will be sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. §3553(a)(2)(C).

### C. The Recommended Sentence Will Afford Adequate Deterrence to Criminal Conduct by Others.

Deterrence is the most difficult of the §3553 factors to quantify or assess. The government routinely argues—without empirical support—that longer sentences equate to stronger deterrence. Numerous scientific studies have confirmed that longer sentences do <u>not</u> deter crime to a greater degree than shorter sentences. It is the certainty of detection and conviction that deters crime, not the length of any threatened sentence. Even if we eschew the criminological research, conventional wisdom validates this fact. The threat of high fines or even jail time for speeding or reckless driving deters no one from engaging in such behavior. But, everyone slows down and drives appropriately when they see a police car on the side of the road. It is not the threat of a severe sanction that deters us, it is the certainty of detection and conviction that does.

> Research to date generally indicates that increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits.
> . . . .
> Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment. . . .

Valerie Wright, Ph.D., <u>Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment</u>, pp. 1,4 (found at *https://webpage.pace.edu/jhumbach/Crim-SentencingProject %20Reporton Deterrence.pdf*). (Emphasis in the original). The study concluded that

> [e]xisting evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive. Overall, the evidence indicates that the deterrent effect of lengthy prison sentences would not be substantially diminished if punishments were reduced from their current levels.

<u>Id</u>., at p. 9.

If the January 6 investigations and prosecutions—including this one—have proven anything, it is that illegal, disorderly protests and attacks on government property and personnel cannot be committed with anonymity or impunity. All now know with certainty that such conduct will be aggressively investigated and the perpetrators identified, arrested, tried, and convicted. It is this "certainty" of punishment rather than the potential "severity" of punishment that will serve to deter others from conduct similar to the events of January 6. For those who are not so deterred because they do not believe—despite the ample evidence to the contrary—that they will ever be identified, caught, and prosecuted, no sentence, no matter how severe, will have any greater deterrent effect than the one recommended herein.

The ease with which defendant's conduct and identity were uncovered by investigators; her very public arrest, prosecution, and conviction; a sentence of 1 year home incarceration and a 3 year term of supervised release, with the attendant strict controls and conditions that it entails; plus the potential of additional terms of imprisonment if the

conditions of supervised release are violated are powerful deterrents and onerous and serious sanctions that will definitely deter like minded individuals from committing similar crimes.

Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirement of 18 U.S.C. §3553(a)(2)(B).

### D. The Recommended Sentence Will Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

While punishment is only one of the §3553 factors to be considered by the Court in imposing sentence, it *is* a factor. However, punishment must be just under the circumstances of the case. These are serious offenses, to be sure. It would be disingenuous of counsel to suggest otherwise, but a guideline sentence for someone with no significant prior terms of incarceration to punish her conduct, no prior opportunity for treatment to correct her behavior, and no chance to conform her conduct to the requirements of supervised release is excessive; and an excessive sentence is not a punishment that is just as required by the statute. Nor does an unjust sentence promote respect for the law. Just the opposite.

Congress specifically contemplated that conduct such as defendant's could be adequately punished by the recommended sentence, otherwise it would have imposed a mandatory minimum term of imprisonment, which it did not. Accordingly, the recommended sentence is within the range of punishment contemplated by Congress and would constitute a just sentence that reflects the seriousness of the crime. Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirement of 18 U.S.C. §3553(a)(2)(A).

## Conclusion

Ms. Stallings has owned up to her conduct, admitted it to others, and accepted full responsibility for it. She fully understands the wrongfulness of her conduct; is motivated and, indeed, eager to change; and will do whatever is necessary to make certain that she does not re-offend. One year home incarceration as part of a 3 year term of supervised release subject to the usual mandatory and standard conditions imposed by statute and U.S.S.C. §5D1.3 and such other conditions as the Court may deem appropriate will be "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offenses; afford adequate deterrence to criminal conduct by others, protect the public from further crimes of the defendant, and provide her with needed correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2).

Shelly Stallings should *not* escape punishment, but that punishment should be a just punishment, not one that serves only one of the purposes of sentencing to the exclusion of all of the others. Justice and respect for the law are promoted by reasonable sentences, rehabilitation, and the safe return of offenders to society. Shelly *can* be redeemed. She is worthy of redemption. The Court should give her that chance by imposing the recommended sentence.

/s/ Scott T. Wendelsdorf (Ky. Bar No. 75790)
Federal Defender
629 Fourth Avenue
200 Theatre Building
Louisville, Kentucky 40202

(502) 584-0525
Scott_Wendelsdorf@fd.org

Counsel for Defendant.

**CERTIFICATE**

    I hereby certify that on March 27, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Scott T. Wendelsdorf